## P. A. Wilson, Administrator of W. H. Wilson, Deceased, P. A. Wilson, Individually, and Fannie E. Wilson v. David Wilson.

(Decided March 23, 1917.)

### Appeal from Daviess Circuit Court.

1. Bastards—Illegitimacy in General—Non-access—Evidence.—When legitimacy is denied, the burden is upon the one who asserts it to prove that the child was begotten in wedlock, and then the burden shifts, so as to require the one denying it to overcome the presumption by requisite proof. In cases where it is admitted that the parents have access to each other, and opportunities for access, it should be shown that it was impossible for the child to have been the issue of the marriage, or to have been begotten by the husband; but if the evidence. fairly shows that there was neither access, nor opportunities for access, it is sufficient to overcome the presumption of legitimacy, for the jury to believe from clear, convincing and satisfactory testimony that there was no access or opportunities for access, and that the issue is therefore illegitimate.

2 Bastards—Legitimacy—Evidence.—Evidence of the conduct of the parents towards each other and toward the child are relevant upon the issue of legitimacy, and if the evidence fairly shows neither access, nor opportunity for access, the declaration of the parents as to the legitimacy of the child may be admitted in corroboration of non-access.

3. Divorce—Pleading.—The pleadings of one of the parties in a divorce suit are admissible as part of the conduct of that parent, but the contents of depositions of witnesses in his behalf are too remote and not admissible as a part of that parent's conduct.

4. Bastards—Non-access—Lewd Conduct of Wife—Evidence.—When one asserting legitimacy attempts to show that the husband, at and prior to the time the child was begotten, was living with the wife, cohabiting with her, it is competent for the other party to show that at that time the wife was being kept by another man

who slept with her frequently all night, and that she engaged in other lewd and lascivious conduct, upon the ground that it corroborates the other testimony of the one disputing legitimacy, that the husband at that time was away, and furthermore that the wife's conduct furnished a motive for his being away, and it also has a tendency to contradict the testimony that the husband was then living with his wife.

5. Bastards—Lewdness of Mother—Evidence.—Testimony that the mother and the child were jointly engaged in running a bawdy house is not admissible upon the issue as to whether they sustain the relationship of parent and child, as the inferences to the contrary to be drawn from such evidence are too remote.

6. Trial—Examination of Witnesses—Conduct of Court.—The court has a wide latitude in permitting the examination of witnesses and in conducting the trial, and it is his right to himself interrogate the witnesses for the purpose of clearing up obscurities in the testimony; but it should not engage in cross examination of the witnesses in such a manner as to indicate that the court disbelieved the witness and to create such impression with the jury. The action of the court throughout the trial should be free from partiality and from manifestation of it toward the one side or the other.

7. Bastards—Verdict—Evidence.—Where the evidence shows that the father left the community about four years before the child was born, and remained away until about two months before it was born, most of the time in the state of Florida, and that during that time the wife was leading an immoral life, and that the alleged father and the child never saw each other, and in no manner communicated with each other, and that the husband stated on numerous occasions throughout his life, which lasted some thirty odd years, after the birth of the child, that he had no children, and the only evidence contradicting this is that of the mother and her sister, stating that during all of the time of the husband's proven absence he lived with the wife as her husband, a verdict in favor of the legitimacy of the child is held to be flagrantly against the evidence, nothwithstanding the presumption in favor of legitimacy.

L. I. IGLEHART, J. R. HAYS and W. P. SANDIDGE for appellants.

PHILLIP C. GOULD, FRANK C. MALIN and R. M. HOLLAND for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellee (plaintiff) is seeking by this suit to have himself adjudged to be the legitimate child of Joseph A. Wilson, who died intestate in March, 1913, in Louisville, Ky. The suit is for the purpose of settling and distributing the estate of W. H. Wilson, who died intestate, a res-

ident of Daviess county, on June 13, 1915, a bachelor and without father or mother surviving, but leaving as his heirs his brother and sister, who are the appellants (defendants) in this suit. It is claimed by plaintiff that he is entitled by inheritance in and to a one-third interest in the estate of W. H. Wilson, being the same which his alleged father would have inherited had he lived. As a foundation for his claim he states in his pleadings that Joseph A. Wilson, his supposed father, married his mother, who was Sarah Murphy, on July 15, 1874, and that plaintiff was born of that marriage on December 24, 1877. A divorce had been obtained by Joseph A. Wilson in a suit filed for that purpose on October 30, 1877, the judgment having been rendered something like twenty days before the birth of plaintiff. The answer denied that Joseph A. Wilson was ever married to plaintiff's mother, or that he is her child, and denied that plaintiff was begotten of the marriage or is the child of Joseph A. Wilson. A trial before a jury resulted in a verdict finding plaintiff to be the legitimate offspring of the marriage, and adjudged him entitled to the relief which he sought by this suit, and to reverse that judgment this appeal is prosecuted.

There are many questions urged upon us and they are extensively and searchingly discussed with numerous citations of authorities, but the limits of this opinion will not permit us to do more than state our conclusions, with reference to such authorities as we deem necessary to support them. The principal grounds for a new trial presented for our consideration are: (1) The refusal of the court to permit the introduction of evidence offered by defendants; (2) That the verdict is flagrantly against the evidence; (3) Error of the court in suspending the argument and recalling, upon its own motion, a witness who had testified for the defendants, and indulging at that time in a cross-examination of the witness; and (4) Error in giving and refusing instructions to the jury.

We will, as briefly as possible, discuss the grounds in the order named. The offered, but rejected, evidence of which complaint is made may be divided into three subdivisions: (a) The rejection of testimony of witnesses to the effect that plaintiff's mother, at just before and after the alleged marriage between herself and Joseph A. Wilson, was living, at her mother's cabin in the suburbs of Owensboro, Ky., a lewd and lascivious life; that after the marriage and during the time the plaintiff's mother testified that Joseph A. Wilson was living at that

house with her as her husband, she was being kept by another man, who frequently stayed with her all night and on many occasions would be seen sitting in her lap, and that her sisters, who were living in the same house, were engaged in the same or similar conduct. As stated, the plaintiff's mother and her sisters, during the time to which the rejected testimony related, were occupants of that house and lived the character of life indicated, and she and one sister swore that Joseph A. Wilson was, at that time, and from then on up to about the time of the filing of the divorce suit, living with the plaintiff's mother as her husband. The court rejected the testimony upon the ground that it did not relate to the time when the plaintiff, in the course of nature, must have been begotten. If this was the only purpose for which the testimony was offered, and the only relevancy which it could have had in the case, as presented, there could be no fault found with the court's action in rejecting it; but the testimony was offered for a different purpose which is, to contradict the statements of plaintiff's mother and her sister that at the time of the conduct proposed to be proven, Joseph A. Wilson, without protest, or any character of rebellion was living with his wife in apparent contentment, so far as the record shows, as husband to her. A legitimate purpose of testimony is to place the court or jury in possession of the circumstances, so that it may be determined by the rules of human experience whether a particular fact contended for, or testified to, did or did not occur. Looking at the question from this standpoint, it is clear to our minds that the testimony is competent, because it is wholly repugnant to all ideas of decency, as well as respect for one's self, that he would uncomplainingly submit to such a course of conduct by his wife and continue to live with her as her husband. Experience has taught that such conduct is universally fruitful of separation and divorce suits, and we think the testimony was calculated to have a potent effect on the question whether or not the supposed wife and her sister were telling the truth when they stated in their testimony the facts we have just related. Moreover, it is the contention of defendants that Joseph A. Wilson, directly after his supposed marriage, left that vicinity and within less than a year thereafter went to the state of Florida, where he remained until the late summer or fall of 1877, and that he, therefore, neither had access, nor opportunity of access, to his wife, Sarah, and, therefore, could not have begotten the plaintiff. The rejected testimony

is relevant and should have been admitted upon a well-understood rule of evidence, permitting a litigant to show a motive for an act, the truth of which he asserts. Measured by the same rule of human experience and observation, if conduct of the character indicated in the rejected testimony was being indulged in by the supposed wife, as well as other members of the household, it is easy to divine a motive for the deportment of the supposed husband in separating from his wife and leaving the vicinity. We conclude then that this testimony should have been admitted, and that the court committed prejudicial error against the defendants in rejecting it.

(b) The defendants offered to introduce the depositions of N. O. Wilson, the father of Joseph, and that of W. H. Wilson, the deceased, in this case, which were taken and filed in Joseph A. Wilson's divorce suit, but the court declined to allow this testimony to be introduced. It is seriously urged upon us that the depositions were competent as constituting a part of the conduct of Joseph A. Wilson with reference to his supposed wife, and also that they were admissible as pedigree statements. The conduct of an alleged parent toward his supposed child as well as toward the other spouse has often been before the courts in questions of legitimacy and such conduct has most generally been admitted. Goss v. Froman, &c., 89 Ky., 318; Banbury Peerage Case; Morris v. Davis, 3 C. & P., 427; and many other cases which might be cited. In the Froman case where an analogous question was before this court, in admitting the character of testimony now under consideration, it is said:

"If such proof of conduct, declarations, etc., were not admitted as proof, it would be almost impossible to prove that the husband and wife had declined to have sexual intercourse with each other."

It was strenuously contended in that case that the testimony was incompetent to prove illegitimacy, but the court, for the reasons stated, decided otherwise. If we were not fortified with the authorities referred to we would still be inclined to admit the character of evidence under consideration in this character of investigation. If the conduct is such as looks to the repudiation of the marital vow as well as the offspring of the relation, it is an unnatural one and is a departure from the usual and ordinary course, and furnishes a circumstance to show that the parent whose conduct is being inquired into did not regard the offspring as his child. The ordinary course would be that of affection, and one of close,

careful and tender watchfulness, and when the conduct is contrary to these natural tendencies, it furnishes a circumstance which the court or the jury trying the case may consider for whatever, it is worth. This, however, should not be carried to such an extent as to include everything that might be remotely classified as *conduct*, especially when the introduction of it would violate other fundamental rules governing the introduction of testimony. One of these fundamental rules which its admission here would violate is that testimony taken in one suit is not evidence in another as against one who was not a party to the first one. Kerr v. Gibson, 8 Bush 130; Heth. v. Young, 11 B. Mon. 278; Oliver v. L. & N., 17 Ky. L. R. 840.

We do not think that the activities of Joheph A. Wilson in procuring the witnesses in question to testify in his divorce suit and causing their depositions to be filed therein, is such conduct on his part as will justify us in permitting their introduction in this case against plaintiff under any exception of the rule just stated, known to us. The conduct which is admissible in this character of case should be free and unbiased conduct and not prompted by any motives of gain or success and we know that it is a general rule that a litigant is greatly prompted to win his case, if possible, and his conduct in procuring his testimony is not of that free and unbiased character which would entitle it to admission under the rule now under consideration.

(c) In an effort to combat the idea that the plaintiff is the son of Sarah Wilson, *nee* Murphy, the depositions of a number of witnesses were taken in Evansville, Ind., to show that after plaintiff and his mother left Owensboro, Ky., in 1884, and perhaps from 1902 to 1906, he and his mother were engaged in the business of running an assignation house in that city, and the inference is sought to be thereby drawn that such a life is so repugnant to both morals and decency that no mother would jointly engage in it with her son, and that, consequently, the plaintiff is not the child of the woman whom it is claimed Joseph A. Wilson married. We think that this testimony endeavors to travel too far around the barn in order to get to the issue. Ordinarily, and in the great generality of cases, it would be presumed that a mother and son would not engage in such a joint enterprise, but it must be remembered that the defendants in this case are relying very largely for their defense upon the

character of the alleged mother and the life she lived. It is a matter of observation that the same conclusions may not be drawn from the action and conduct of a character like defendants' testimony shows plaintiff and his mother, or alleged mother, to be, and those which would be drawn from the conduct and life of one who holds in the highest regard a decent, orderly, moral and upright life. We believe that the conclusions sought to be drawn from this rejected testimony are so remote as to render it of a non-probative force, and that it was, therefore, properly rejected.

(d) Defendants offered to introduce testimony showing that Joseph A. Wilson, after obtaining his divorce and before he died, made statements that he had no children, which testimony the court rejected, and of which complaint is made. A great portion of the briefs are devoted to this point. As stated at the beginning it will be impossible to discuss the numerous cases referred to or to undertake to differentiate them. Both they and the text books clearly show that where access between the parents, or opportunity for access, is either admitted or fairly shown, the declarations of the parents may not be admitted for the purpose of illegitimatizing their child, but the following cases hold, as we understand them, to the qualified rule that if there is responsible testimony showing non-access or no opportunity for access, such statements may be admitted in corroboration of such testimony. They are: Dennison v. Page, 20 Pa. St. 420; Mebane v. Capeheart, 37 S. E. 84; Erwin v. Bailey, 123 N. C. 628; In Re Gird's Estate, 108 Pac. 501; Patterson v. Gaines, 6 How. 550; Morris v. Davis, 3 C. & P. 427; Woodward v. Blue, 107 N. C. 407; Appeal of McDonal, 23 Atl. 892; Banbury Peerage Case; Vernon v. Vernon's Heirs, 6 La. 242; Legge v. Edmunds, 25 L. J., N. S., Ch. 125; Jones on Evidence, Sections 97 and 312; Goss, etc. v. Froman, etc., 89 Ky. 318.

In 7 Corpus Juris 944, under the head of declaration of parents, the general rule above referred to is stated, with the qualification: "And declarations of a deceased parent (Joseph A. Wilson being deceased at the time) concerning relationship, birth, or marriage, are admissible, although legitimacy or illegitimacy is thereby affected. So that declarations of a person since deceased that an illegitimate child was not his child are admiss-

ible to rebut the claim of recognition by him that the child was his."

The declarations of the parent in the Froman case, while not of the same character as the ones involved here, were, in substance, that there had been no intercourse between the father and mother within the period of gestation. The effect of this is to show that the child in question was not that of the parent making the declarations. According to our view there would be much more opposition to the introduction of that character of declaration than of the one now under consideration. In order to admit the declaration made in that case, not only the sanctity of the marital relation, but of the marital bed was compelled to be invaded. It allowed to be divulged those secrets which are so essential to be preserved in order to protect the sanctity of the home. While the statements involved here might, in a sense, be subjected to the same criticism, yet for reasons hereinbefore stated they would be unnatural ones if they were false. And our conclusion is that under the facts and circumstances of this case the offered testimony should have been admitted. An examination of the authorities relied upon by plaintiff in refutation of what we have said, will show that the rejected declaration was made at a time when access was either admitted or an opportunity for it was fairly shown. And that, therefore, it does not come within the reasons stated in the adjudged cases allowing its introduction.

In considering the second objection, which is that the verdict is flagrantly against the evidence, it becomes necessary to, as briefly as possible, state its substance. In cases of this character it is necessary, in order to establish legitimacy, that two things be proved: First, marriage; and, second, birth of the child at a time when, in the course of nature, it must have been begotten in wedlock. When the evidence is sufficient to authorize a finding that these two facts exist, the burden shifts to the one disputing legitimacy to disprove it. There was evidence in this case (without stating it) to establish both of these facts and we are not authorized to say that the verdict of the jury so finding is against the weight of the evidence or flagrantly against it. In an effort to rebut the presumption of legitimacy of the plaintiff, the defendants offered the evidence which the court re-

jected and which we have considered. They proved by several witnesses that shortly after the alleged marriage, Joseph A. Wilson left Owensboro and went to McLean county, Kentucky, from which place, about a month thereafter, he went to Louisville and in the summer or fall of 1875, he went to Orlando, Florida, where he lived and stayed until the summer or early fall of 1877, the year in which plaintiff was born. It would serve no useful purpose to enumerate the witnesses by whom these facts are proved, but suffice it to say that .the testimony appears to have been given by witnesses of the best standing; detailed circumstances are related by some of them, showing almost conclusively that what they state about the matter is the truth. During all the time when Joseph A. Wilson is claimed by plaintiff's mother to have been in Owensboro, the defendant's witnesses show almost unerringly that he was in Florida. He never saw the plaintiff nor did plaintiff ever see him. During the period covered by his claimed absence from Owensboro no one is positive that he was back there, even on a visit, except the plaintiff's mother and her sister. It is true that some witnesses say that they saw him along about that time, but their testimony is exceedingly shadowy as to the precise time. In other words, they testify with no certainty as to whether the times they mentioned were before his departure from Owensboro or after his return from Florida. He is not shown to have voted there or paid any taxes, not even a poll tax, and the record is entirely silent upon any fact or circumstance, outside of the testimony of Sarah and her sister, showing that during this time he was in Owensboro. Not only do the witnesses in Florida testify to his absence from Owensboro, but also some who remained in Owensboro. In addition to this positive testimony are the statements found in his petition for a divorce as to the lewd and lascivious life that his wife was living and as to the length of their separation. It is true he states therein that he was a resident of Daviess county, but this, no doubt, was inserted by his attorney for jurisdictional purposes. He is found making declarations, as we have seen, that he had no children, and every act and circumstance of his life points to-the truth of that fact, so far as we can gather from this record. With the testimony in this condition the law seems to be that if the fact of non-access or no oppor-

tunity for access is clearly and satisfactorily shown, it would be the duty of the jury to find the plaintiff not to be the child of Joseph A. Wilson. The general rule seems to be stated in Jones on Evidence, section 94, to be:

"There has been much controversy on the point whether in order to rebut the presumption, the proof should show that it is impossible or merely improbable that the husband should be the father of the child. But the rule seems now well established in England and in this country that the non-access need not be shown beyond any possible doubt, but the presumption of legitimacy is so highly favored that the *proof of non-access should be clear and satisfactory.* And when access, that is, an opportunity for sexual intercourse is shown, the presumption of legitimacy is very strong indeed, though not conclusive; it still being a question for trial whether such intercourse has actually taken place. Thus it is open to proof, notwithstanding the strong probabilities to the contrary, that there was not in fact sexual intercourse, although the parties may have lived in the same house."

In 7 Corpus Juris 945, in discussing this rule it is said: "With respect to the weight of evidence required, it has been held that it need not go to the extent of showing the absolute impossibility of legitimacy. It must, however, be clear, distinct and convincing, and sufficient to prove the fact to the satisfaction of the jury."

In 3 R. C. L. 728, it is said: "The authorities which take these views (impossibility) are in the minority, the great weight of authority being to the effect that access, that is, an opportunity for sexual intercourse, need not be shown to have been impossible."

In the Froman case, in discussing this point, the court said: "It is also contended that where the parties have opportunities for access (sexual intercourse), the child begotten in wedlock is conclusively presumed to be legitimate. We do not so understand the law as to either proposition." (The other proposition concerns the conduct of the parties toward each other and their statements as to non-access.)

The opinion then proceeds to discuss the strength of the presumption of the legitimacy where access is admitted, or opportunity therefor is shown. In such cases, as we shall see, the one denying legitimacy must show

that it was impossible for the father and mother to have had intercourse. In other words, where the conditions are admitted, or proven to be such that intercourse was probable, the presumption of legitimacy is so conclusive that nothing short of showing it to have been impossible for the child to be legitimate will suffice to destroy the presumption. When, however, access is not admitted, and when there is evidence sufficient to satisfactorily convince the court or jury trying the case, that there was no opportunity for access, no such conclusive presumption prevails. An investigation of the subject will show the strict and modified rules as to the presumption of legitimacy, in cases like this, to be as above indicated. A more detailed statement of the history of, and present condition of, the law upon the subject is that the presumption of legitimacy of a child born or begotten in lawful wedlock was so strong under the English common law that, to overcome it, the one disputing the legitimacy was required to show that at the time the child must have been begotten, and during pregnancy of the wife, the husband was not merely away from his wife, but was "beyond the four seas," meaning thereby, out of the realm. 5 Cyc. 627; 2 Coke Litt. 244a; Shelby v. ............... ..........................., 13 Ves. Jr. 56; 7 Corpus Juris 940-1; Blackstone's Commentaries, Book I, 457.

But "this ancient rule has been so far relaxed that in modern times this presumption may be overcome by showing that the husband had no opportunity for intercourse, and the jury, from all the facts are to infer whether intercourse did, or did not take place." 5 Cyc. 627. Under the majority of the cases, and which we think is the sounder rule, where access is either admitted or the opportunity for it is reasonably certain from the evidence, the presumption of legitimacy will prevail unless the jury are convinced that it was impossible for the husband to have been the father of the child. Such were the facts upon which the opinions of this court were based in the cases of Sergent v. North Cumberland Manufacturing Co., 112 Ky. 888, and Buckner's Admr. v. Buckner, 120 Ky. 595, relied on by counsel for plaintiff, and also the still later case, not referred to, of Vanover v. Steele, 173 Ky. 114.

In the case now here, access is not only not admitted, but the evidence greatly preponderates that there was no opportunity for it, and in such case, as the authori-

ties *supra* will show, the jury are not required to believe that it was impossible for the husband to have been the father of the child in order to find it to be illegitimate, but it may do so if the circumstances and evidence show clearly and conclusively to a reasonable mind that there was neither access nor opportunity for it at or about the time the child must have been begotten according to the laws of nature. In other words, we mean to say that when the decision of the question turns upon the fact of access, or non-access, of the husband to the wife, the usual presumption of legitimacy does not require the jury to be convinced from the evidence that access was *impossible* or to be convinced beyond all possible doubt that there were no opportunities for access. We do not think either the requirements of, or the reasons for, the presumption, will compel the jury, although convinced to the contrary, to shut its eyes to the truth and blindly return a verdict against the overwhelming weight of the evidence, because, forsooth, it may have been physically possible for the husband to have had access to his wife. The quantum of proof in such cases being only that which we have indicated.

In the light of this modern rule and looking to the testimony which we have reviewed, is the verdict flagrantly against the evidence? The phrase "flagrantly against the evidence" means that character of evidence by which the law permits the establishment or non-establishment of the fact inquired into, and if the verdict is contrary to the quantum of evidence necessary to establish or to refute the fact, it is flagrantly against the evidence. Measuring the testimony by this rule, we are bound to conclude that it was clearly and satisfactorily shown that there was neither access nor opportunity for access on the part of Joseph A. Wilson to his wife, Sarah, and that the verdict is, therefore, flagrantly against the evidence.

Turning now to the third objection, it appears that after the evidence had been introduced, the jury instructed, and an argument for each side heard, the court observed a witness who had testified in the case, sitting in the court room, and on his own motion called her to the stand and proceeded to examine her concerning some of the matters about which she had testified. Her testimony detailed when introduced by defendants related to the character of life which Sarah Murphy was leading

in Owensboro after the alleged marriage, and the witness, while testifying upon the stand, attempted to fix a date by some entry on a picture which she had. She stated that the picture was at home and the court asked her to go and bring it into court. It appears that the witness did not return and the judge saw her for the first time after the argument had begun. Without setting out in detail the examination the court then gave the witness, it was, in substance, an inquiry about the picture which the witness then had, and the entry claimed to have been made on it by the witness, the court indicating that he could see no entry and also indicating that he disbelieved what the witness was saying or had said. In other words, it appears, although the court perhaps may not have intended it, that he assumed the role of advocate and was endeavoring to develop, by cross-examination of the witness, a disbelief in her testimony. Courts, in presiding at trials, properly have a wide latitude in permitting, or engaging in, the examination of witnesses, and it is their duty to, in an unbiased way, conduct the examination and even engage in it so as to develop the facts, but he should always be guarded so as to manifest no partiality in the trial. As said in 38 Cyc. 1316:

"So in the conduct of the examination the court should be careful not to indicate by words or manner his disbelief of the witness, and should not make remarks or comments on the witnesses or their testimony which may tend either to magnify or diminish in the minds of the jury the effect of such testimony either as to credibility or value."

It is a known fact that the average juror is prone, and naturally so, to attach great weight to the conviction of the presiding judge as to the rights of the litigants, and if he should in any manner indicate before the jury what those convictions are, he transgresses his duties. Moreover, the complaint here is additionally justifiable because the transaction occurred after the evidence had been closed and a part of the argument heard, the record not showing that either side recalled the witness. We are convinced that the learned judge who tried the case did not intend to depart from his true course, but we believe his conduct was calculated to perhaps mislead the jury and it should not have been indulged in.

The instructions upon another trial should tell the jury, in substance, that if they should believe from the evidence that Joseph A. Wilson and Sarah Murphy married, and after that the plaintiff was born as a result of the marriage at a time when, according to the course of nature, he must have been begotten during wedlock, they will find for the plaintiff, unless they are clearly and satisfactorily convinced from all of the testimony that Joseph A. Wilson, the alleged father of plaintiff, neither had access, nor opportunity for access to, nor sexual intercourse with his wife, Sarah Murphy, in which event, if they so believe, they will find for the defendant.

What we have said dispenses with the necessity of considering the ground of newly discovered evidence.

Wherefore, the judgment is reversed, with directions to grant a new trial, and for proceedings consistent with this opinion.